**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>BLANK LABEL GROUP, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-10286 (JTD)<br><br>Jointly Administered<br><br>Obj. Deadline: July 20, 2023 at 4:00 p.m. (EDT)<br>Hearing Date: July 27, 2023 at 3:00 p.m. (EDT) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER TO SURCHARGE
EXPENSES INCURRED BY THE DEBTORS IN PRESERVING AND
MAXIMIZING THE VALUE OF THE DEBTORS' ASSETS AND LIMITING A
POSTPETITION LIEN ON PROCEEDS PURSUANT TO 11 U.S.C. §§ 506(c) AND 552(b)**

The above-captioned debtors and debtors in possession (each, the "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court (the "Motion") for entry of an order substantially in the form of **Exhibit A** attached hereto, to (i) surcharge the Collateral (defined below) for expenses incurred by the Debtors in preserving, maintaining, and disposing of the Collateral, and (ii) limit any purported lien on the Sale Proceeds (defined below) based on the equities of the case, pursuant to sections 506(c) and 552(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). In support of this Motion, the Debtors respectfully represent as follows:

**JURISDICTION**

1. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding within the meaning

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Blank Label Group, Inc. (6183); BlackLapel Custom Clothiers, Inc. (3725); and Ratio Clothing, LLC (8330). The Debtors' mailing address is 36 Bromfield Street, 204, Boston, MA 02108.

of 28 U.S.C. § 157(b)(2)(K). Venue of this proceeding and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are Bankruptcy Code sections 105(a), 506(c), and 552(b).

3. Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## PROCEDURAL BACKGROUND

4. On March 8, 2023 (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code as a debtor defined in section 1182(1) of the Bankruptcy Code and the Debtors elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code pursuant to the Small Business Debtor Reorganization Act, as amended (the "Chapter 11 Cases").

5. The Debtors are operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6. As discussed more fully in the *Declaration of Fan Bi in Support of First Day Relief* [D.I. 12] (the "First Day Declaration"),[2] the Debtors filed the Chapter 11 Cases with the goal of expeditiously selling nearly all of the Debtors' assets (the "Assets") through a court-approved process (the "Sale").

7. On March 9, 2023, the United States Trustee appointed Jami Nimeroff of Brown McGarry Nimeroff LLC to serve as the Subchapter V trustee (the "Subchapter V Trustee")

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

in the Chapter 11 Cases pursuant to Bankruptcy Code section 1183(a). No other trustee, examiner, or official committee has been appointed in these cases.

8. Peter Furman of HunterPoint LLC was retained as Chief Restructuring Officer (the "CRO") [D.I. 110] to run the Sale and the Debtors' businesses; and John Bambach of Bambach Advisors was retained as an independent director to make the ultimate decisions with respect to the Sale and the Debtors' businesses (the "Independent Director," and collectively with the CRO, "Current Management").

9. Certain creditors (the "Purported Secured Parties") have asserted purported secured claims and liens[3] against certain personal property and any proceeds thereof (the "Collateral") of Debtors Blank Label Group, Inc. ("Blank Label") and BlackLapel Custom Clothiers, Inc. ("BlackLapel"). By the terms of the Sale Order (defined below) and as further discussed below, such purported claims and liens attach to the Escrowed Funds. *See* Sale Order ¶¶ 7, 22 & 26.

10. Additional detail regarding the Debtors, their businesses, the events leading to commencement of the Chapter 11 Cases, and the facts and circumstances supporting the relief requested herein is set forth in the First Day Declaration and is incorporated herein by reference.

**FACTUAL BACKGROUND**

**A.      The Increase in Valuation of Assets and Successful Sale**

   *a.      The Marketing Process of the Assets*

---

[3] The Debtors, their professionals, and Current Management are currently analyzing and reconciling all proofs of claims lodged against the Debtors including those of the Purported Secured Parties, and presently challenge the priority of certain of those claims as being secured under section 506(a) of the Bankruptcy Code. To that end, on June 23, 2023, BlackLapel filed that certain *Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547, 548, and 550 and to Disallow and Reclassify Claims Pursuant to 11 U.S.C. § 502* (the "Adversary Proceeding") against Settle Funding, LLC ("Settle"). The Debtors reserve and preserve all of their rights with respect to the priority and status of the claims of any and all of the Purported Secured Parties, and do not waive any of their rights in the Adversary Proceeding and the chapter 11 cases generally by the filing of this Motion.

11. On March 7, 2023, the Debtors negotiated an Asset Purchase Agreement (the "Stalking Horse Agreement") with H.M. Cole, LLC ("H.M. Cole") to purchase substantially all of the Debtors' Assets.

12. Under the terms of the Stalking Horse Agreement, H.M. Cole was to purchase the Assets of the three Debtors for a total of $750,000.00 (the "Original Bid"), with $150,000.00 allocated to Blank Label, $450,000.00 allocated to BlackLapel, and $150,000.00 allocated to Ratio Clothing, LLC ("Ratio Clothing") [D.I. 10 Ex. B § 2.04]. In addition, the Original Bid contemplated $500,000.00 would be allocated as a Transition Management Fee for Fan Bi's assistance and expertise in transitioning the businesses to H.M. Cole.

13. After the Petition Date, the Debtors, the CRO and their professionals undertook extensive efforts to market the Assets to provide the Debtors' estates with more value than originally provided for in the Stalking Horse Agreement.

14. As discussed in the *Declaration of Peter A. Furman, Chief Restructuring Officer of the Debtors, in Support of the (I) Sale of the Purchased Assets of the Debtors to H.M. Cole, and (II) Entry of the Sale Order* [D.I. 141] (the "First Furman Declaration"), the CRO held numerous conversations with previous management about the Debtors' pre-petition marketing efforts[4] and communicated with several of the potentially interested parties that were previously contacted prior to the Petition Date regarding the Sale. *First Furman Declaration* ¶¶ 6 & 13.

15. Additionally, the CRO employed various measures to ensure a robust marketing process, including exploring numerous avenues for attracting potential bidders. In this regard, the CRO: (1) reached out to a brand acquisition specialist in his professional network; (2) consulted with an investment banker to explore whether anyone in his database would possibly

---

[4] The pre-petition marketing efforts are more fully described in the First Day Declaration.

4

have interest in purchasing the Assets; (3) contacted seven potential buyers that had shown interest pre-petition in purchasing the Assets to explore if there was renewed interest; and (4) made at least eleven "cold-calls" to other competitors in the Debtors' niche area within the e-commerce industry to assess interest and invite them to evaluate strategic synergies with the Debtors' respective businesses. *First Furman Declaration* ¶ 17.

16. At every step during the marketing process, the CRO worked and consulted with Debtors' counsel, who reviewed all bids and communicated with potential purchasers. The Debtors' also made efforts to advertise the Sale, including by publishing ads in *DailyDac* and *USA Today*.

17. Additionally, as discussed in the *Declaration of Peter. A. Furman, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Reply in Support of Motion for Entry of an Order Extending Time to File Plan Pursuant to 11 U.S.C. §§ 105 and 1189(b)* [D.I. 173] (the "Second Furman Declaration"), the Debtors' financials were in a state of total disarray prior to the Current Management being retained. *Second Furman Declaration* ¶ 8. Further, the Debtors' prior management failed to provide clarity with respect to the financials. *Second Furman Declaration* ¶ 11.

18. In order to properly market the Assets and afford potential bidders with sufficient information, the CRO and the Debtors' third-party accountants that were retained in the Chapter 11 Cases had to expend an enormous amount of time, effort, and resources updating the financials.

19. As a result of the Debtors' professionals' efforts in marketing and updating financials, the Debtors received two bids, one of which was deemed to be a Qualifying Bidder[5] for Ratio Clothing.

### b. The Auction and Sale

20. Pursuant to the Bidding Procedures approved by the Court, an auction of the Debtors' assets was conducted at the offices of Debtors' counsel on May 15, 2023 (the "Auction"). Through the Auction, H.M. Cole revised its Original Bid to provide the Debtors' estates a total of $1,100,000.00, and accordingly reduced the Transition Management Fee to $150,000.00 (the "Revised Bid").

21. The Revised Bid reallocated value such that the individual offer in each case was as follows: (1) $200,000.00 for Blank Label's Assets (a $50,000 increase from the Original Bid); (2) $700,000.00 for BlackLapel's Assets (a $250,000 increase from the Original Bid); and (3) $200,000.00 for Ratio Clothing's Assets (a $50,000 increase from the Original Bid).

22. In essence, the Revised Bid provided greater value to the Debtors' estates due to the revised allocations of value to the Debtors' Assets by expanding the pool of funds made available to the Debtors' estates from $750,000.00 (the Original Bid) to $1,100,000.00 (the Revised Bid).

23. At the Auction, the Revised Bid was deemed the successful bid (the "Successful Bid") [D.I. 141 ¶ 21-22].

---

[5] The term "Qualifying Bidder" is defined in the Bidding Procedures, which is attached as Exhibit 1 the *Order (I) Approving (A) Bidding Procedures for the Sale of Substantially all Assets of Debtors, (B) Entry into Stalking Horse Agreement and Related Bid Protections, (C) Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases, (D) Scheduling the Auction and Sale Hearing and (E) Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith, (II) Approving (A) the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances and (B) the Assumption and Assignment of Designated Executory Contacts and Unexpired Leases and (III) Granting Related Relief* [D.I. 61].

24. On May 25, 2023, the Court entered the sale order approving the Successful Bid and authorizing the Sale [D.I. 154] (the "<u>Sale Order</u>").

25. On May 31, 2023, the Sale closed.

**B.    Further Expenses Incurred in Maintaining, Disposing, and Increasing the Value of the Collateral**

26. As discussed herein, the Debtors' efforts through the Sale have substantially increased the value of Blank Label's and BlackLapel's Assets by providing an additional $300,000.00 to their respective estates.

27. Additionally, since the commencement of these chapter 11 cases, the Debtors and their professionals have undertaken a variety of efforts (and incurred related costs and expenses, in an amount which has yet to be fully quantified) to preserve and maintain the assets of the Debtors' estates, including, but not limited to, updating the Debtors' financials to establish and preserve the Sale Proceeds; and managing and preserving the Sale Proceeds as Escrowed Funds (as defined in the Sale Order).

**C.    The Subchapter V Trustee's Work**

28. Alongside the efforts of the Debtors and their professionals, the Subchapter V Trustee proactively engaged in the Chapter 11 Cases in anticipation that the Debtors would sell the Assets and worked to assure the Debtors held a robust and successful Auction and Sale.

29. Specifically, due to the Subchapter V Trustee's diligence and time spent researching the Debtors financials and other documents, she reached out to counsel for the Debtors to inquire about certain issues and subsequently raised the question of independent voices, which led to the hiring of the Current Management. She also contributed to the hiring of the Current Management. Because of the Subchapter V Trustee's work alongside the Debtors and the Debtors' counsel, the Sale Proceeds were substantially greater than the Original Bid.

30. As such, the Subchapter V Trustee's work benefited the Purported Secured Parties. The Subchapter V Trustee did not seek to interfere with the Debtors' marketing and Sale of the Assets. To the contrary, she aided the Debtors' efforts with respect to the Sale.

**RELIEF REQUESTED**

31. By this Motion, the Debtors seek entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, to (i) surcharge the Collateral for expenses incurred by the Debtors and their professionals in maintaining and disposing of the Collateral; and (ii) limit the Purported Secured Parties purported lien on the Sale Proceeds based on the equities of the case, pursuant to 11 U.S.C. §§ 506(c) and 552(b) of the Bankruptcy Code, respectively.

**BASIS FOR RELIEF**

**A.      Surcharge of the Sale Proceeds**

32. Bankruptcy Code Section 506(c) provides, "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim . . . ." 11 U.S.C. § 506(c). Section 506(c) is an express statutory exception to the general rule that a secured creditor is not responsible for paying the costs of administration of a bankruptcy case. *See In re Towne, Inc.*, 536 F. App'x 265, 268 (3d Cir. 2013); *Matter of Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir. 1982).

33. Thus, the Bankruptcy Code expressly provides the Court with authority to surcharge a secured creditor for "expenses that are specifically incurred for the express purpose of ensuring that the property is preserved and disposed of in a manner that provides the secured creditor with a maximum return on the debt." *United Jersey Bank v. Miller (In re C.S. Assocs.)*, 29 F.3d 903, 906 (3d Cir. 1994).

34. A party seeking to recover under § 506(c) has two separate pathways to do so.

35. First, a claimant can "demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a direct benefit to the secured creditors." *Id.*; *see also In re C.S. Assocs.*, 29 F.3d 903, 906 (3d Cir. 1994) (citing *Equibank, N.A. v. Wheeling Pittsburgh Steel Corp.*, 884 F.2d 80, 84, 86-87 (3d. Cir. 1989)); *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94-95 (3d Cir.1986)). The Third Circuit "has adopted a broad definition for determining direct benefit." *In re Midatlantic Bank, N.A. v. Peco Energy Co.*, 1996 WL 135339 *3 (E.D. Pa. Mar. 19, 1996) (citing *In re McKeesport*, 799 F. 2d. at 94).

36. Alternatively, a party seeking recovery under § 506(c) may demonstrate that the secured creditor consented to the expenditures incurred by a debtor and that the expenditures were related to the preservation or disposition of the subject property. *See In re Orfa Corp. of Philadelphia*, 170 B.R. 257, 273 (E.D. Pa. 1994).

37. Courts in the Third Circuit have recognized a second, more permissive test to determine whether collateral may appropriately be surcharged against a secured creditor where the secured creditor consents to the expenditures. *See Orfa*, 170 B.R. at 272-273. As *Orfa* explains, quoting 3 Collier, ¶ 506.06 at 506–61 (15th ed. 1993) (footnote omitted), "[Where] the holder of a secured claim has consented to the related preservation or disposition [of its collateral] ... the court may treat such consent as an advance acknowledgement that certain of the costs and expenses incurred would benefit such holder. Thus, when such consent has been given, the courts will allow a greater latitude with respect to allowance of costs and expenses." *Orfa*, in the next paragraph, goes on to say "the "greater latitude" referred to indicates that where consent is found, a

9

bankruptcy court need not be as rigorous in determining whether the costs and expenses claimed were reasonable and necessary." *But see In re Quaker Distributors, Inc.*, 1996 WL 89361 (Bankr. E.D. Pa. February 27, 1996) ("[a]lthough consent may be shown circumstantially through the secured creditor's actions, consent is not to be lightly inferred.") (citations omitted).

38. Here, should the Court hold that the Purported Secured Parties possess valid security interests—which remain subject to the Debtors' continued review and analysis and, with respect to Settle, the Adversary Proceeding—the Debtors seek to recover the costs and expenses incurred by the estate to maximize the value of the Collateral through the Sale.

39. The Debtors, by bringing in the Current Management and undertaking extensive marketing and a robust Auction, completed a successful Sale of Blank Label's and BlackLapel's Assets for the benefit of the Purported Secured Parties. In fact, assuming the Purported Secured Parties are indeed secured creditors, the Sale has improved their position by vastly increasing the value of the Collateral and to cover purported secured claims that were unsecured under the terms of the Original Bid. Specifically, the Debtors' efforts in effectuating the Sale increased the Sale Proceeds for BlackLapel from $450,000.00 to $700,000.00, and Blank Label from $150,000 to $200,000. Moreover, the Debtors continue to preserve the value of the Collateral through ongoing updates to the financials and maintaining the Escrowed Funds.

40. Therefore, the Debtors may recover from the Purported Secured Parties the allowed administrative expenses of the Independent Director, the CRO, and the Debtors' professionals (the "<u>Fees and Expenses</u>"), which are the costs associated with the above-referenced efforts to preserve and maximize the Collateral pursuant to 11 U.S.C. § 506(c) for the following reasons.

41. First, the Debtors' efforts leading to the Fees and Expenses were reasonable. The Fees and Expenses amounts that were earned by the CRO were capped on a fixed-fee basis at $8,750.00 per week, regardless of the level of experience or amount of time spent in incurring such administrative expenses. The amounts included in the Fees and Expenses attributable to time spent by the Debtors' counsel were reasonable in light of the time spent and rates charged for such services, and are commensurate with the complexity, importance, and nature of the issues addressed, and are subject to review, challenge and approval pursuant to the procedures approved by this Court under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [D.I. 84] and the *Order Approving Procedures for the Retention and Compensation of Ordinary Course Professionals* Nunc Pro Tunc *to the Petition Date* [D.I. 83]. Without those expenditures included in the Fees and Expenses, the Debtors would have either failed to sell the Assets in the Auction (let alone have an auction) or the Auction would have concluded with a much lower sale price, as is evidenced in the Original Bid.

42. Second, the Debtors' efforts leading to the Fees and Expenses were necessary to preserve, maintain, and dispose of, the Collateral. In response to the Court's concerns of a lack of independent voices, the resources spent on retaining the Current Management were needed to ensure the Sale would be successful, and therefore in accordance with the Bankruptcy Code. Further, the painstaking process of updating the financials was necessary to conducting a robust Auction, which *substantially* increased the value of the Purported Secured Parties' alleged security interest against Blank Label and BlackLapel, respectively, from being barely secured, to being comfortably oversecured. Additionally, further updates to those financials are necessary to continually maintain the value of the Escrowed Funds, so that the Sale Proceeds can be accurately disbursed to creditors in connection with each Debtor. Therefore, to the extent the Purported

Secured Parties have any security interest in the Sale Proceeds, the Debtors' efforts are maintaining that value.

43. Third, the Debtors' efforts that led to the Fees and Expenses provided a direct benefit to the Purported Secured Parties. The above expenditures resulted in a robust and successful Auction. Not only did these measures result in a successful Sale, which provided a direct financial benefit to the Purported Secured Parties' alleged security interests, but Current Management was able to further enhance the value of the Sale Proceeds allocated to Blank Label and BlackLapel considerably, providing a further direct benefit to the applicable Purported Secured Party. A direct benefit may be the increase in value of a debtor's assets in liquidation when a service preserves the going concern value. *See, e.g.*, In re Midatlantic Bank, N.A., 1996 WL 135339.

44. Regardless of whether the Chapter 11 Cases had been filed, the Purported Secured Parties would have had to expend resources at least as commensurate with the Fees and Expenses in order to satisfy their respective proofs of claim. It is also important to recognize that the Debtors' previous management had left the Debtors' financials in disarray and the Sale would have been near impossible but for the services of the Current Management and Debtors' professionals.

45. As discussed above, many of the efforts of the Debtors—and much of the work of its professionals—in the Chapter 11 Cases were in step with the Purported Secured Parties' interest in amplifying the valuation of the Assets, as well as the success of the Sale.

46. Alternatively, if the Court was to adopt the permissive approach based on consent, as discussed in *Ofra*, surcharge of the Collateral for expenses incurred by the Debtors would still be appropriate.

47. Each of the Purported Secured Parties were aware of the estates' efforts and expenditure of resources in this regard because they directly consented to them in connection with certain agreements and had actual knowledge, including insofar as they received notice of all bankruptcy case filings, which included their filing of their respective proofs of claim. By the time of the Sale Hearing and entry of the Sale Order, each of the Purported Secured Parties (including Settle and West Town Bank & Trust who lodged formal and informal objections) consented to the Sale. Therefore, the Debtors are entitled to surcharge the Collateral and recover the Fees and Expenses.

**B.     Equities of the Case Exception**

48. Section 552(b)(1) of the Bankruptcy Code entitles a secured party to extend its lien on proceeds of its prepetition collateral to the proceeds of a debtor's post-petition collateral if applicable nonbankruptcy law and the security agreement so provide, "except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b) (emphasis added); *see, e.g.*, *United Va. Bank v. Slab Fork Coal Co.*, 784 F.2d 1188, 1191 (4th Cir.1986) (holding that equities of the case may allow bankruptcy court to cut off pre-petition security interest in post-petition proceeds).

49. "Courts generally limit the application of this exception to Chapter 11 cases in which evidence establishes that the lender is over secured, and will obtain a windfall 'from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value.'" *In re Tower Air, Inc.*, 268 B.R. 404, 408 (Bankr. D. Del. 2001), *aff'd*, No. 00-1280 (RJN), 2003 WL 21398007 (D. Del. June 16, 2003), *aff'd*, 397 F.3d 191 (3d Cir. 2005) (quoting *Delbridge v. Prod. Credit Ass'n,* 104 B.R. 824, 826 (E.D.Mich.1989)). "In applying the equities of the case

exception, courts place significant weight 'on whether a debtor expended unencumbered funds of the estate, at the expense of the unsecured creditors, to enhance the value of the collateral.'" *In re Stacy's, Inc.*, 508 B.R. 370, 380 (Bankr. D.S.C. 2014) (quoting *All Points Capital Corp. v. Laurel Hill Paper Co. (In re Laurel Hill Paper Co.)*, 393 B.R. 89, 93 (Bankr.M.D.N.C.2008); *see also In re Muma Servs., Inc.*, 322 B.R. 541, 558 (Bankr. D. Del. 2005).

50. "The equity exception of § 552(b) was intended to strike 'an appropriate balance between the rights of secured creditors and the rehabilitative purposes of the Bankruptcy Code.'" *Tower Air, Inc.*, 268 B.R. at 408 (quoting *United Va. Bank*, 784 F.2d at 1191).

51. Here, should the Court hold that Settle holds a valid lien on the Debtors' property—which again the Debtors dispute—the "equities of the case" exception under section 552(b) of the Bankruptcy Code should apply.

52. From the Original Bid to the Revised Bid, the value allocated to BlackLapel's Assets increased from $450,000 to $700,000 and Blank Label from $150,000 to $200,000. As a result, certain Purported Secured Creditors (particularly Settle and West Town) went from the verge of being undersecured to being oversecured, and other such creditors went from being wholly unsecured to partially or, perhaps, oversecured. Indeed, if the Debtors are successful in the Adversary Proceeding, the other Purported Secured Parties of BlackLapel will be vastly oversecured.

53. Without a doubt this increase in value of both Debtors' Assets was achieved by using unencumbered estate assets to extensively market the Assets, conduct a robust Auction, and improve the Debtors' financials.

54. All this was achieved without the Purported Secured Parties' participation in any phase of the Chapter 11 Cases yet they now stand to receive a windfall of potentially being

paid in full due to their oversecured status, all to the detriment of the Debtors' professionals and unsecured creditors.

55. Therefore, based on the equities of this case, the Purported Secured Parties' purported liens on the Sale Proceeds should be subject to payment of the Fees and Expenses before any recovery is distributed to them under the Debtors' proposed plan of liquidation.

## NOTICE

56. Notice of this Motion will be provided to: (i) the Purported Secured Parties and their counsel (if known); (ii) the Office of the United States Trustee; (iii) the Subchapter V Trustee; (iv) each of the Debtors' twenty (20) largest unsecured creditors; and (v) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

57. The Debtors have not previously sought the relief requested herein from the Court or any other court.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Proposed Order substantially in the form annexed hereto as **Exhibit A** granting the relief requested in this Motion and (b) granting such other and further relief as may be just and proper.

Dated: July 13, 2023　　　　**PASHMAN STEIN WALDER**
　　　　Wilmington, Delaware　**HAYDEN, P.C.**

　　　　/s/ *Joseph C. Barsalona II*
　　　　Joseph C. Barsalona II (No. 6102)
　　　　1007 North Orange Street, 4th Floor, Suite 183
　　　　Wilmington, DE 19801-1242
　　　　Telephone: (302) 592-6496
　　　　Email: jbarsalona@pashmanstein.com

　　　　-and-

　　　　Richard C. Solow (admitted *pro hac vice*)
　　　　Edward A. Cho-O'Leary
　　　　The Woolworth Building
　　　　233 Broadway, Suite 820
　　　　New York, New York 10279
　　　　Email: rsolow@pashmanstein.com

　　　　*Counsel to the Debtors and*
　　　　*Debtors in Possession*