**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| BLANK LABEL GROUP, INC., *et al.*, | Case No. 23-10286 (JTD) |
| Debtors.[1] | Jointly Administered |
| | **Obj. Deadline: April 14, 2026, at 4:00 p.m. (ET)**<br>**Hearing Date: April 29, 2026, at 11:00 a.m. (ET)** |

**LITIGATION TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (A) DISMISSING THE CHAPTER 11 CASES; (B) AUTHORIZING THE LITIGATION TRUSTEE TO REMIT REMAINING FUNDS TO SECURED PARTY; (C) AUTHORIZING TERMINATION OF THE LITIGATION TRUST; AND (D) GRANTING RELATED RELIEF**

Peter Furman, solely in his capacity as Litigation Trustee (the "Litigation Trustee") of the litigation trust (the "Litigation Trust") created pursuant to the *Subchapter V Debtors' First Modified Amended Plan of Liquidation* [D.I. 313] (together with the Plan Supplement and all exhibits and any other modifications, amendments, or supplements thereto, the "Plan"),[2] hereby moves this Court (the "Motion"), pursuant to sections 105(a), 305(a), 349 and 1112(b) of 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rule 1017(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 1017-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order") (a) dismissing the above-captioned debtors'(the "Debtors") chapter 11 cases (collectively, the "Chapter 11 Cases"); (b) authorizing the Litigation Trustee to remit the Litigation Trust's remaining funds to Settle (as

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are as follows Blank Label Group, Inc. (6183); BlackLapel Custom Clothiers, Inc. (3725); and Ratio Clothing, LLC (8330). The Litigation Trust's mailing address is 641 Lexington Avenue, 15th Floor, New York, New York 10022.

[2] Capitalized terms used but not defined herein shall have the same meanings given to them in the Plan.

defined below), after payment of expenses the Litigation Trust has incurred; (c) authorizing termination of the Litigation Trust; and (d) granting related relief. In support of this Motion, the Litigation Trustee submits the *Declaration of Peter Furman, Litigation Trustee, in Support of Litigation Trustee's Motion for Entry of an Order (A) Dismissing the Chapter 11 Cases; (B) Authorizing Litigation Trustee to Remit Remaining Funds to Secured Party; (C) Terminating the Litigation Trust; and (D) Granting Related Relief* (the "Furman Declaration").

In further support of the Motion, the Litigation Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

As set forth in greater detail herein, the key events in the Debtors' Chapter 11 Cases have been the Sale of their Assets and confirmation of the Plan, which was centered on the creation of the Litigation Trust to investigate and, if warranted, pursue claims and causes of action to recover funds for distribution to Litigation Trust beneficiaries. Funding the Litigation Trust required the consent of a secured creditor, Settle, to the use of its cash collateral to fund the Litigation Trust's expenses while the Litigation Trustee sought to monetize potential claims, including Avoidance Actions and claims against two former insiders.

The Litigation Trustee investigated those potential claims, and where warranted, sought recovery on account of them without the expense and delay of litigation. Unfortunately, that investigation revealed that any potential claims faced significant, if not prohibitive, obstacles on the merits and the collectability of any judgment, making recoveries uncertain at best, and would cost more to litigate than the Litigation Trust's very limited resources could support. Moreover, in the case of the Debtors' former principal, Fan Bi, any potential claims could not be investigated and litigated without retaining counsel willing to do so on a contingency basis. Despite the Litigation Trustee's efforts, he was not able to find anyone so willing.

As a result, the Litigation Trustee has come to the conclusion that there is no realistic prospect for further recovery on any claims or causes of action for the benefit of Litigation Trust beneficiaries. And because the Litigation Trust does not have a realistic path towards further recoveries for the benefit of beneficiaries, and the cost of conversion to chapter 7 would expend what little funds remain on additional administrative costs, conversion presents no corresponding benefit to beneficiaries. The Litigation Trustee therefore seeks an order from this Court dismissing the Chapter 11 Cases, authorizing the remittance of the Litigation Trust's limited remaining funds to pay Outstanding Professional Expenses (as defined below), with the balance to go to the Debtors' first priority secured creditor, terminating the Litigation Trust, and granting such other further relief as the Court deems necessary and proper.

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

2. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B) and (O).

4. The statutory bases for the relief requested herein are sections 105(a), 305(a), 349 and 1112(b) of the Bankruptcy Code, Bankruptcy Rule 1017(a), and Local Rule 1017-2.

5. Pursuant to Local Rule 9013-1(f), the Litigation Trustee confirms his consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### A. Confirmed Plan and Creation of Litigation Trust

6. On March 8, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. On March 10, 2023, the Court entered an order directing that the Debtors' petitions be jointly administered [D.I. 22]. The Debtors operated their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7. On March 9, 2023, Jami Nimeroff of Brown McGarry Nimeroff LLC was appointed as the Subchapter V Trustee (the "Subchapter V Trustee") [D.I. 8]. No official committee has been appointed in these cases. Further facts relating to the Debtors, their background, capital structure, and the circumstances relating to the Debtors' Chapter 11 Cases are set forth in the *Declaration of Fan Bi in Support of First Day Relief* [D.I. 12] and are incorporated by reference herein.

8. On December 7, 2023 (the "Confirmation Date"), this Court entered an order confirming the Plan (the "Confirmation Order") [D.I. 333].

9. The Plan's implementation hinges on "distribution of the Litigation Trust Assets, and prosecution of Estate Causes of Action." Plan at Art. 2.5.

10. To that end, the Plan provided for the establishment of a "Litigation Trust . . . for the purpose of selling any remaining Estate Assets, prosecuting and resolving the [Debtors'] Causes of Action, objecting to Claims, resolving Disputed Claims, and effecting the Distributions to be made under the Plan . . . ." Plan at Art. 2.5(A).

11. The Litigation Trust Agreement, incorporated by the Plan Supplement and approved in connection with confirmation of the Plan, likewise recognizes that the primary purpose of the Litigation Trust is to collect, hold, administer, distribute, and liquidate the Trust Assets for the benefit of the Beneficiaries in accordance with the terms and conditions of the Litigation Trust Agreement and the Plan. Litigation Trust Agreement, at Art. 2.02.

12. The Litigation Trustee was appointed to administer the Litigation Trust pursuant to the terms of the Litigation Trust Agreement.

**B. Litigation Trust's Funding**

13. On May 25, 2023, the Court entered an order (the "Sale Order") [D.I. 154] approving the sale (the "Sale") of substantially all of the Debtors' assets to H.M. Cole, LLC (the "Buyer") for a total of $1,250,000.00, which proceeds were then escrowed (the "Escrowed Funds").[3]

14. With the Sale consummated, the Debtors began the process of formulating, proposing and seeking confirmation of a liquidating plan that would allow the possibility of recovery for creditors.

15. An obstacle to confirming a plan, however, was the presence of certain disputes between the Debtors and Settle Funding, LLC ("Settle"), which asserted a significant secured claim of nearly $450,000, and consistent with the Sale Order asserted a lien on the Escrowed Funds. Over the course of several months after the Sale was approved, the Debtors and Settle,

[3] Pursuant to the Sale Order, the Escrowed Funds remained subject to all liens, claims, encumbrances and interests to which the acquired assets were subject, with the same extent, validity and priority, but with respect to any undisputedly unencumbered Escrowed Funds, the Debtors were authorized to satisfy estate administrative expenses up to $200,000 without further order of the Court. Sale Order, at ¶22.

through litigation and negotiation, sought resolution of those disputes. Ultimately, the parties reached a negotiated settlement that formed the basis for a confirmable plan.

16. On November 13, 2025, the Court entered the *Order (I) Approving the Settlement Agreement by and Among the Debtors and Settle Funding, LLC, and (II) Granting Related Relief* (the "Settlement Order") [D.I. 303], approving the settlement agreement (the "Settlement Agreement") between the Debtors and Settle (the "Settle Settlement").

17. Among its provisions, the Settle Settlement:

a. allowed Settle's asserted secured claim in the amount of $448,840.06, plus attorney's fees and interest at the federal judgment rate as of the Petition Date (the "Allowed Settle Claim");

b. provided for a $150,000 cash payment to Settle (the "Settle Cash Payment") on account of the Allowed Settle Claim within three days of entry of the Settlement Order, the balance to be paid from the Litigation Trust, with Settle having first priority on any distributions from the Litigation Trust before any other distribution or payment is made pursuant to the Plan (the "Payment Priority Right"); and

c. deemed the remaining Escrowed Funds to be Settle's cash collateral (the "Settle Cash Collateral"), available for the Debtors' use only upon the submission to and Settle's agreement with quarterly Litigation Trust budgets setting forth projected sources and uses (the "Budget").[4]

18. The Settle Settlement and the Settlement Order also provided Settle with a first priority security interest in and liens on all claims and causes of action of the Debtors, including but not limited to limited to claims and causes of action under chapter 5 of the Bankruptcy Code and Bankruptcy Code section 724(a) (the "Avoidance Actions") and all proceeds thereof, to extent of any diminution in value of the Settle Cash Collateral from and after the date of the Settlement

[4] The Plan, at Article 2.5(E), also provides that Settle is entitled to first right and claim to all Litigation Trust Assets and no distribution shall occur until the Allowed Settle Claim is paid in full except as provided for in the Litigation Trust Agreement or as authorized under the Budget.

Agreement through confirmation of the Plan resulting from the Debtors' use thereof (the "Adequate Protection Liens").

19. Pursuant to these terms, any Escrowed Funds used to fund the Litigation Trust funds would not be, and are not, unencumbered. Rather, Settle holds a first priority lien on them.

20. In early December 2023, just prior to the Plan's confirmation, the Debtors submitted and Settle approved the Litigation Trust's first quarterly Budget (the "First Budget").

21. On the Effective Date of the Plan on December 22, 2023, after satisfaction of the Settle Cash Payment, administrative expenses, priority claims, and significantly discounted pre-Effective Date professional fees of the Debtors' counsel and the Litigation Trustee (as the Debtors' pre-Effective Date independent director), the Litigation Trust was initially funded with $157,258.82.

22. The Litigation Trustee immediately began the process of marshaling the Debtors' assets[5] and investigating the Litigation Trust's potential claims.

23. In late March 2024, the Litigation Trustee submitted the Litigation Trust's second quarterly budget (the "Second Budget") to Settle. At that time, the Litigation Trust was holding approximately $79,000, having paid certain professional fees and modest payments to secured creditors consistent with the First Budget. The Litigation Trustee did not secure a written confirmation of approval of the Second Budget.

24. However, as discussed in greater detail *infra,* by the third quarter of 2024 the Litigation Trustee's investigation was showing that the litigation claims and causes of action that were envisioned at the time the Plan was formulated and confirmed would not be fruitful enough

---

[5] The Litigation Trustee transferred $44,400 that had been held in the Debtors' debtor in possession accounts as of the Effective Date to the Litigation Trust.

to result in significant recovery to Litigation Trust beneficiaries. Rather, the Litigation Trustee's investigation of claims and causes of action revealed that pursuing them would be uncertain, riddled with challenges on both the merits and collectability of judgments, and importantly, too expensive when weighed against the Litigation Trust's limited cash assets. Although the Litigation Trustee was not yet in a position to determine that the Litigation Trust should be terminated, he made the decision to conserve the Litigation Trust's limited cash while determining whether a viable path to litigation recoveries could be charted.

**C. Litigation Trust's Investigation of Causes of Action**

25. As noted *supra*, the Litigation Trust's potential claims, and therefore potential sources of recovery, fell into three buckets (the "Claim Buckets"): (a) Avoidance Actions; (b) claims against former insider Danny Wong ("Mr. Wong") under clawback causes of action or otherwise (the "Wong Claims"); and (c) claims against Fan Bi ("Mr. Bi") under clawback causes of action or otherwise (the "Bi Claims").

26. With respect to Avoidance Actions, immediately upon the Litigation Trust's inception, the Litigation Trust and counsel began implementing procedures for pursuing Avoidance Actions against clawback targets who had received potentially preferential payments during the three-month period prior to the Petition Date (the "Preference Period"), as well as against potential insiders who had received any payments during the one-year period prior to the Petition Date (the "Insider Transfer Period").

27. To that end, the Litigation Trustee and his counsel engaged in a deep examination of the Debtors' financial records for those periods, identified potential clawback targets and the sums received, and issued demand letters to approximately fifteen domestic and international targets seeking to induce recovery without the need for costly litigation. In order to encourage

targets to voluntarily satisfy their alleged liability without resorting to litigation, the Litigation Trustee also included in the demand letters an offer to settle such preference claims for 85% of their face value.

28. Several of the targets responded, asserting their defenses and potential counterclaims against clawback actions, which the Litigation Trustee evaluated and determined were viable. Other targets did not respond to the Litigation Trustee's settlement offer, but the Litigation Trustee determined, as a matter of business judgment and after further research and investigation, that pursuing litigation against those targets was likely to be too risky and costly to justify the relatively modest potential recoveries that might be obtained.[6] The Litigation Trust was therefore only able to recover a settlement payment from one target, in the amount of $9,615.00.

29. With respect to the Wong Claims, on April 30, 2024, the Litigation Trustee filed the *Motion for Order Authorizing the BLG Litigation Trust to (A) Conduct a 2004 Examination of Danny Wong; and (B) Seek Related Document Production* [D.I. 363] (the "Rule 2004 Motion"). After the Litigation Trustee conducted substantial and extended negotiations with Mr. Wong and his counsel, who advised that Mr. Wong had been living in South Korea for several years, the Court entered an *Order Directing Examination of Danny Wong and the Production of Document* [D.I. 369] (the "Rule 2004 Order") on May 30, 2024, without any objections from Mr. Wong.

30. On July 22, 2024, counsel for Mr. Wong tendered his responses and document production for the Rule 2004 examination. After reviewing Mr. Wong's responses and nearly 2,000 pages of document production, the Litigation Trustee determined that pursuing further

[6] With the exception of Mr. Wong, whose situation warranted separate consideration due to the Plan's requirement for a 2004 examination, the average potential preference exposure for the remaining targets after accounting for likely meritorious defenses was less than $25,000 each. Moreover, further investigation showed that several targets were effectively unpursuable, due to the fact that they were situated in foreign jurisdictions with no apparent American assets to attach, no longer in existence, and/or otherwise unlocatable.

litigation against Mr. Wong was not justified given the expense of doing so, based on the evidence available at the time, but reserved final judgment on the matter until after a Rule 2004 examination against Mr. Bi could be completed. This determination was based on several factors, including but not limited to, (a) the existence of potentially meritorious substantive defenses against any clawback action, including that Mr. Wong was neither a statutory nor non-statutory insider and had not been actively involved in the Debtors' management for many years; (b) the nature and complexity of any clawback claims against Mr. Wong; (c) the need to retain a forensic accounting expert to trace transfers between Mr. Wong's and Mr. Bi's numerous personal and business accounts, both domestic and international; (d) the lack of certainty as to obtaining a judgment in an amount sufficient to offset the costs of such litigation and net a positive recovery for Litigation Trust beneficiaries; (e) the apparent difficulty of immediately collecting any substantial amounts from Mr. Wong's international assets even if judgment were entered against Mr. Wong in the United States; and (f) the limited funds immediately available to the Litigation Trust.

31. With respect to the Bi Claims, the Litigation Trustee first needed to retain counsel to pursue any such claims on a contingency basis. Upon his appointment the Litigation Trustee began a comprehensive search for counsel to investigate and potentially litigate the Bi Claims. Due to the anticipated broad scope of the Bi Claims and the Litigation Trust's limited assets, however, it became apparent that any counsel would need to be retained on a contingency basis. The Litigation Trustee engaged in preliminary discussions with twenty to thirty firms either experienced in litigating or financing clawback actions on behalf of bankruptcy estates and their stakeholders, or serving as a referral source for such firms. Despite these exploratory conversations with a large pool of professionals, and even tentatively proposing to utilize remaining Litigation Trust assets to cover upfront litigation expenses, however, the Litigation

Trustee was unable to retain counsel, with firms citing concerns regarding a contingency fee on a relatively modest potential liability, the potential defenses to the Bi Claims, the complexity and cost of investigation into and litigation of the Bi Claims, and the dubious collectability of any resultant judgments from Mr. Bi's assets, which are known to at least be partially sheltered in China, Australia, and other countries overseas.

32. As indicated by the above discussion of the obstacles the Claims Buckets face, the Litigation Trustee believes the Litigation Trust has reached an endpoint in its investigation and potential litigation of claims and causes of action. The investigation has revealed that the further pursuit of claims and causes of action by the Litigation Trust faces prohibitive hurdles on the merits and collectability, is not cost-effective given the Litigation Trust's relatively modest assets, and does not present a realistic path for recovery for trust beneficiaries. As such, the Litigation Trustee believes the time has come to dismiss the Chapter 11 Cases, terminate the Litigation Trust, and make final payments of the trust's limited funds.

## RELIEF REQUESTED

33. By this Motion, the Litigation Trustee respectfully requests entry of the Proposed Order: (a) dismissing the Debtors' Chapter 11 Cases; (b) authorizing a final distribution of the Litigation Trust's remaining funds; (c) authorizing termination of the Litigation Trust; and (d) granting related relief.

## BASIS FOR RELIEF

### I. The Court Should Dismiss the Chapter 11 Cases.

#### A. The Chapter 11 Cases Must Be Dismissed Under Section 1112(b)(1) of the Bankruptcy Code.

34. Upon the request of a party in interest, section 1112(b) of the Bankruptcy Code provides that, absent unusual circumstances, a court "shall" dismiss a chapter 11 bankruptcy case

(or convert such a case to a case under chapter 7) "for cause." *See* 11 U.S.C. 1112(b)(1). The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") changed the statutory language with respect to conversion or dismissal from permissive to mandatory.[7] *See* H.R. Rep. No. 109-31(I), at 442, reprinted in U.S.C.C.A.N. 88, 94 (stating that the Act "mandate[s] that the court convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause, absent unusual circumstances"); *see also Nester v. Gateway Access Sols., Inc. (In re Gateway Access Sols., Inc.),* 374 B.R. 556 (Bankr. M.D. Pa. 2007) (stating that the amendments to section 1112 limit the court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of good cause); *accord In re TCR of Denver, LLC,* 338 B.R. 494, 498 (Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal, such that this Court has no choice, and no discretion, in that it '*shall*' dismiss or convert a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4).") (emphasis in original).

35. The amendments to section 1112 of the Bankruptcy Code thus limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause. *See In re 3 Ram, Inc.,* 343 B.R. 113, 119 (Bankr. E.D. Pa. 2006) ("Under new § 1112 when cause is found, the court *shall* dismiss of convert unless special circumstances exist that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate.") (emphasis in original); *see also In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007).

[7] Prior to the enactment of BAPCPA, a bankruptcy court had discretion, pursuant to its broad equitable powers, to dispose of a debtor's case, including by means of dismissal. However, a court was not mandated to dismiss upon the showing of cause. H.R. Rep. 95-595, at 405 (1977), reprinted in 1978 U.S.C.C.A.N. 5963; S. Rep. No. 95-989, at 117 (1978), reprinted in 1978 U.S.C.C.A.N. 5787.

36. "Courts consider the totality of the circumstances in determining whether there is cause for dismissal." *In re LJH Enters.,* Case No. 10-34355-H3-11, 2011 WL 597034, at *3 (Bankr. S.D. Tex. Feb. 11, 2011) (citing *Peterson v. Atlas Supply Corp. (In re Atlas Supply Corp.)*, 857 F.2d 1061 (5th Cir. 1988)). For reasons more fully explained below, the Court should dismiss the Chapter 11 Cases, as cause exists in view of the totality of the circumstances. Further, dismissal (and not conversion to a case under chapter 7) is in the best interests of the Debtors' estates and their creditors because there is not a realistic path towards further recoveries for the benefit of beneficiaries, and the cost of conversion to chapter 7 would expend what little funds remain to distribute.

**B. Cause Exists Under Section 1112(b)(4) of the Bankruptcy Code.**

37. Section 1112(b) of the Bankruptcy Code provides a nonexclusive list of 16 grounds for dismissal for cause. 11 U.S.C. § 1112(b)(4)(A)-(P). *See Gateway Access Solutions,* 374 B.R. at 561 ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'") (quoting *First Jersey Nat'l Bank v. Brown (In re Brown),* 951 F.2d 564, 572 (3d Cir. 1991)); *Frieouf v. U.S. (In re Frieouf)*, 938 F.2d 1099, 1102 (10th Cir. 1991) (stating that section 1112(b) of the Bankruptcy Code's list is nonexhaustive); *In re 3 Ram, Inc.,* 343 B.R. at 117 ("While the enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, [and] not exhaustive has not.") (citation omitted).

38. One such ground is where a party-in-interest shows that (i) there has been a "loss" or "diminution" of value of the estate and (ii) the debtor does not have a "reasonable likelihood of rehabilitation." *See* 11 U.S.C. § 1112(b)(4)(A).

39. Another such ground is where a party-in-interest shows the inability to effectuate substantial consummation of a confirmed plan. *See* 11 U.S.C. §1112(b)(4)(M); *In re Am. Cap. Equip., LLC,* 688 F.3d 145, 162 n.10 (3d Cir. 2012) ("the '"inability to effectuate a plan" remains a viable basis for dismissal because the listed examples of cause [in section 1112(b)] are not exhaustive'") (quoting *DCNC N.C. I, LLC v. Wachovia Bank*, Case Nos. 09-3775, 09-3776, 2009 WL 3209728, at *5 (E.D. Pa. Oct. 5, 2009)). For purposes of section 1112, substantial consummation has three components:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
>
> (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). Inability to effectuate a plan arises, among other things, where the "core" of "a workable plan of reorganization does not exist." *In re Blunt,* 236 B.R. 861, 865 (Bankr. M.D. Fla. 1991).

40. Here, there has been, and continues to be, diminution in the value of the Litigation Trust's assets available for distribution to beneficiaries, and the core needed to replenish and grow those assets in order to commence distributions under the Plan, *i.e.* recoveries through the Litigation Trust's prosecution of causes of action, does not exist.

41. As noted above, the Litigation Trust was initially funded with approximately $157,000 of Escrowed Funds. Those funds served as cash collateral for the Allowed Settle Claim, and at the time the Plan was confirmed it was envisioned that the Litigation Trust would use those funds to investigate, and where warranted, pursue claims and causes of action that would yield

recoveries for the benefit of the Litigation Trust beneficiaries, with distributions going first to satisfy the Allowed Settle Claim.

42. Since the Effective Date, however, the Litigation Trust has incurred professional fees associated with the Litigation Trustee and his counsel's investigation into the Wong Claims and attempts to recover amounts from potential Avoidance Action targets by consensual means, as well as payments for certain tax services. While engaged in efforts to investigate and recover funds through causes of action, the Litigation Trust has also made modest payments on allowed secured claims and priority tax claims under the Plan. As a result of these expenses and Plan payments, the Litigation Trust is currently left with only $67,941.10.

43. Counterbalancing these ongoing administrative expenses and nominal distributions, the Litigation Trust's potential sources of recovery were to be the Avoidance Actions, the Wong Claims, and the Bi Claims. After the Litigation Trustee's investigation, however, it has become evident that the prospects of recovery are dim and face various significant obstacles.

44. With respect to the Avoidance Actions, the Litigation Trust has recovered a relatively de minimis amount of less than $10,000 based on informal demand letters sent to potential targets and subsequent negotiated settlement. The Litigation Trustee determined, however, that the overwhelming majority of potential Avoidance Actions faced significant hurdles based on the relatively modest amounts at issue, the targets' likely defenses, and/or the collectability of any judgments. Faced with these hurdles and the expense of prosecuting Avoidance Actions with dwindling cash assets, the Litigation Trustee and his advisors made the determination that the costs of pursuing any Avoidance Actions beyond the demand letter stage

were not justified by any potential recoveries the Litigation Trust might garner for potential distribution.

45. With respect to the Wong Claims, which included potential preference and fraudulent transfer claims under the Bankruptcy Code and/or state law, the Litigation Trustee and his advisors incurred the expense of seeking and obtaining discovery against Mr. Wong, who lives in South Korea, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. The Litigation Trustee and his professionals reviewed the documents Mr. Wong produced, but determined that Mr. Wong likely had meritorious defenses to potential claims. The Litigation Trustee also had significant concerns about the complexity, expense, and uncertainty of litigating claims against Mr. Wong as well as the collectability of any judgment that might be obtained. These concerns included consideration of the fact that any litigation against Mr. Wong would necessarily also involve litigation against Mr. Bi and that Mr. Wong's assets appeared likely to be scattered internationally, thus placing them outside of the immediate reach of any collections efforts based solely on a United States court judgment. As such, like the Avoidance Actions, the Litigation Trustee determined that the merits, litigation expenses, and collection risks outweighed any potential benefit in pursuing claims against Mr. Wong.

46. Finally, with respect to the Bi Claims, as noted *supra,* the Litigation Trustee sought to retain counsel to investigate and, if appropriate, pursue those claims. However, because of the potential scope of the Bi Claims investigation and the fact that the Litigation Trust has very limited assets with which to pay counsel for this work, it was determined that any retention would need to be on a contingency basis. As discussed above, the Litigation Trustee had preliminary discussions with approximately thirty firms to explain the nature of the potential Bi Claims and litigation, as well as the need to retain counsel on a contingency basis. Ultimately, no firms agreed to move

forward with representing the Litigation Trust, citing concerns regarding its contingent nature, the relatively modest recovery at stake, the potential merits and defenses, the complexity and cost of investigation and litigation, and the collectability of any judgment. As such, notwithstanding his efforts, the Litigation Trustee has been unable to retain counsel to investigate and pursue the Bi Claims. Moreover, given the concerns expressed by the firms with which the Litigation Trustee had preliminary conversations, the Litigation Trustee does not believe he will be able to retain counsel in the future. The Trustee believes that a chapter 7 trustee would similarly have difficulty finding contingency counsel under the same circumstances.

47. As the above discussion highlights, at this stage the Litigation Trust is left with a diminished pool of funds—already reduced by ongoing professional expenses and modest distributions to secured creditors and priority taxes—and no realistic prospect for litigation recovery that would result in distribution to Litigation Trust beneficiaries. Moreover, to the extent that any such recovery might even potentially exist, it is near certain it would not reach any creditors outside of Settle's much larger secured claim. The Litigation Trustee therefore submits that the estates have been, and will continue, to diminish if these Chapter 11 Cases were to continue with no corresponding benefit or prospect for distribution under the Plan. Dismissal of the Chapter 11 Cases at this stage and termination of the Litigation Trust is therefore appropriate.

### C. Dismissal of the Chapter 11 Cases is Warranted Under Section 305(a) of the Bankruptcy Code.

48. Cause also exists to dismiss these Chapter 11 Cases pursuant to section 305(a) of the Bankruptcy Code, which provides that the "court, after notice and a hearing, may dismiss a case under this title . . . at any time if—(1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . ." 11 U.S.C. § 305(a); *see In re AMC Investors, LLC*, 406 B.R. 478, 487-88 (Bankr. D. Del. 2009).

49. Whether dismissal is appropriate under this provision is determined on a "case-by-case basis" and "rests in the sound discretion" of the bankruptcy court. *In re Sky Grp. Int'l, Inc.*, 108 B.R. 86, 91 (Bankr. W.D. Pa. 1989). Many factors are considered when determining the best interests of creditors and the debtor, including: (i) the economy and efficiency of administration, (ii) whether federal proceedings are necessary to reach a just and equitable solution, (iii) whether there is an alternative means of achieving an equitable distribution of assets, and (iv) whether the debtor and the creditors are able to work out a less expensive out-of- court arrangement that better serves all interests in the case. *AMC Investors*, 406 B.R. at 488 (quoting *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)).

50. Here, as described above, cause exists for dismissal under section 305 of the Bankruptcy Code. The Litigation Trustee does not believe that there are any additional potential recoveries that would warrant keeping the Chapter 11 Cases open, and dismissal of the Chapter 11 Cases will allow the Litigation Trust to avoid the incurrence of further professional fees. Furthermore, under the circumstances, conversion to chapter 7 would impose additional administrative costs with no corresponding benefit to creditors or their estates. Dismissal of the Chapter 11 Cases as set forth in this Motion, coupled with termination of the Litigation Trust, provides the most efficient, cost-effective procedure for allowing a final distribution of the remaining Litigation Trust assets.

**D. Dismissal is in the Best Interests of the Debtors' Creditors and Their Estates.**

51. While the Chapter 11 Cases remain pending and the Litigation Trust open, the Litigation Trust continues to accrue professional fees and expenses. The Litigation Trustee believes, however, that there is no longer a prospect for making a distribution to any Litigation Trust beneficiary other than Settle, given its Payment Priority Right, and a modest one at that.

Thus there is no reason, nor are there funds available, to further pursue litigation as envisioned when the Litigation Trust was created. Accordingly, the Litigation Trustee submits that cause exists to dismiss the Chapter 11 Cases.

52. Once a court determines that cause exists to dismiss a chapter 11 case, the court must also evaluate whether dismissal is in the best interests of the estate and creditors. *See In re Calrissian LP*, Case No. 17-10356, 2018 WL 3854004, at *2 (Bankr. D. Del. Aug. 10, 2018); *In re Superior Sliding & Window, Inc.*, 14 F.3d 240, 243 (4th Cir. 1994) ("Once 'cause' is established, a court is required to consider this second question of whether to dismiss or convert.") (citing *In re Finney*, 992 F.2d 43, 45 (4th Cir. 1993)). As set forth herein, a variety of factors demonstrate that it is in the best interests of the Debtors' creditors to dismiss the Chapter 11 Cases and authorize the relief sought herein.

53. *First*, dismissal of a debtor's case meets the best interests of creditors test where a debtor has nothing left to reorganize and the debtor's assets are fixed and liquidated. *See In re BTS, Inc.*, 247 B.R. 301, 310 (Bankr. N.D. Okla. 2000); *Camden Ordnance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 799 (E.D. Pa. 2000) (finding that a reorganization to salvage a business which ceased doing business was not feasible); *Royal Trust Bank, N.A. v. Brogdon Inv. Co., Inc. (In re Brogdon Inv. Co.)*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (dismissing chapter 11 case in part where there was "simply nothing to reorganize" and no reason to continue the reorganization). Here, while the context differs from pre-confirmation, the Litigation Trustee has determined as a matter of business judgment that further pursuit of the Litigation Trust's litigation claims is not viable (whether legally or economically), and the Litigation Trust's assets are fixed and liquidated in the limited amount the Litigation Trustee presently has on hand.

54. *Second*, courts have found that dismissal is in the "best interests of creditors" where an interested party, other than the debtor, supports the dismissal of the debtor's chapter 11 case. *See Camden Ordnance*, 245 B.R. at 798; *In re Mazzocone*, 183 B.R. 402, 414 (Bankr. E.D. Pa. 1995), *aff'd*, 200 B.R. 568 (E.D. Pa. 1996) (factors weighed more heavily in favor of dismissal of chapter 11 case rather than conversion to chapter 7 where debtor and U.S. Trustee both favored dismissal). Prior to filing this Motion, the Litigation Trustee consulted with Settle, the primary party that would stand to benefit from the Litigation Trust's continued pursuit of claims and causes of action. Settle does not object to the relief requested herein.

55. *Third*, a court may find dismissal to be in the "best interests of the creditors" where a debtor demonstrates the ability to oversee its own liquidation. *See Camden Ordnance*, 245 B.R. at 798; *Mazzocone,* 183 B.R. at 412 ("Only when a Chapter 11 debtor has no intention or ability to . . . perform its own liquidation . . . should a debtor be permitted to remain in bankruptcy[.]"). Here, although the Litigation Trustee submits that this factor is inapplicable to the facts and circumstances of these proceedings given that the Plan was already confirmed and Litigation Trust already formed, the Debtors already liquidated their operating assets through the Sale to the Buyer, and the Litigation Trustee has already evaluated the Litigation Trust's claims and determined that they hold little or no prospect of garnering recoveries.

56. *Fourth*, dismissal is appropriate where, as here, the dismissal of a chapter 11 case will maximize the value of a debtor's estate, because conversion to chapter 7 would impose substantial and unnecessary additional administrative costs with no hope or expectation that the estate and unsecured creditors would receive more consideration. Under the circumstances, where Settle holds the secured Allowed Settle Claim and Payment Priority Right, a chapter 7

trustee would have no funds to satisfy additional claims arising after conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

## II. <u>All Orders Entered in These Cases Should Remain in Effect.</u>

57. The dismissal of a chapter 11 case ordinarily vacates all orders previously entered by the bankruptcy court and restores all parties to the prepetition status quo. *See* 11 U.S.C. § 349(b). A bankruptcy court may, however, "for cause, order[] otherwise . . . ." *Id.* Courts in this jurisdiction have regularly allowed orders, including those approving releases and settlements, to be given continued effect after a dismissal, notwithstanding section 349 of the Bankruptcy Code. *See, e.g., In re TSAWD Holdings, Inc.*, No. 16-10527 (MFW) (Bankr. D. Del. Mar. 23, 2021) [Docket No. 4833] (giving continued effect to orders entered throughout the pendency of the chapter 11 cases, including sale orders); *In re RM Wind-Down Holdco LLC*, No. 18-11795 (MFW) (Bankr. D. Del. Feb. 18, 2020) [Docket No. 721] (same); *In re The Bon-Ton Stores, Inc.,* No. 18-10248 (MFW) (Bankr. D. Del. Feb. 1, 2019) [Docket No. 1488] (same); *In re Sunco Liquidation, Inc.*, No. 17-10561 (KG) (Bankr. D. Del. Nov. 6, 2017) [Docket No. 865] (giving continued effect to orders entered throughout the pendency of the chapter 11 cases).

58. Given the circumstances and posture of these Chapter 11 Cases, the Litigation Trustee submits that ample cause exists to allow all prior orders, releases, stipulations, settlements, rulings, and judgments entered by the Court in connection with these Chapter 11 Cases or any related adversary proceeding to be given continued effect, notwithstanding the requested dismissal. The relief requested is necessary to protect the Debtors' estates, the Litigation Trustee, and the Litigation Trust, and preserve the authority the Debtors and the Litigation Trustee have had to act pursuant to the various orders entered by this Court during the course of the Chapter 11 Cases.

## III. The Court Should Authorize and Direct the Litigation Trustee to Remit the Litigation Trust's Remaining Funds, After Payment of Outstanding Professional Expenses, to Settle as a Secured Party with Payment Priority Right.

59. As discussed *supra*, Settle holds the Allowed Settle Claim. Pursuant to the terms of the Settlement Agreement, the Settlement Order, and the Plan, (a) the remaining Escrowed Funds serve as Settle Cash Collateral, (b) Settle holds the Payment Priority Right with respect to any distribution or payment from the Litigation Trust until the Allowed Settle Claim is paid in full, and (c) Settle holds the Adequate Protection Liens on the Litigation Trust's Avoidance Actions.

60. These Court-approved encumbrances and rights render Settle a first priority secured creditor with respect the Litigation Trust's remaining funds, which are wholly insufficient to satisfy the Allowed Settle Claim. The Litigation Trustee therefore seeks authority to remit the Litigation Trust's remaining funds to Settle, subject to the payment of the Outstanding Professional Expenses (defined below), in full and final satisfaction of the Allowed Settle Claim.

61. In investigating potential claims and causes of action, the Litigation Trust has incurred the professional fees of the Litigation Trustee and his counsel. The Litigation Trustee's outstanding fees total almost $50,000, and the Litigation Trust's counsel's outstanding fees are in excess of $100,000 (the "Outstanding Professional Fees").

62. It is clear that there are not and will not be sufficient funds in the Litigation Trust to satisfy these Outstanding Professional Fees. Therefore, rather than seek payment of a portion of such fees from the remaining Liquidation Trust funds, the Litigation Trustee and his counsel have agreed to waive their remaining Outstanding Professional Fees. The Litigation Trustee and Settle have agreed, however, that prior to the distribution of the Litigation Trust's remaining funds to Settle, the Litigation Trustee may satisfy the outstanding expenses of the Litigation Trustee and his counsel, which total approximately $6,700 (the "Outstanding Professional Expenses").

63. Upon Court approval of the relief sought herein, and after payment of the Outstanding Professional Expenses from the Litigation Trust's funds, the Litigation Trustee will pay the remaining funds to Settle, which will result in a recovery of approximately 47% recovery on the Allowed Settle Claim (including the Settle Cash Payment).

**IV. <u>The Court Should Authorize Termination of the Litigation Trust.</u>**

64. As noted *supra*, the Litigation Trust Agreement provides that the primary purpose of the Litigation Trust is to collect, hold, administer, distribute, and liquidate the Trust Assets for the benefit of the Beneficiaries in accordance with the terms and conditions of the Litigation Trust Agreement and the Plan. Litigation Trust Agreement, at Art. 2.02.

65. The Litigation Trust Agreement also provides that the Litigation Trustee shall endeavor not to unduly prolong the Trust's duration. *Id.* at Art. 3.01.

66. The Litigation Trust terminates "upon payment of all costs, expenses, and obligations incurred in connection with administering the Trust, and the Distribution of all Trust Assets in accordance with the provisions of the Plan, the Confirmation Order, and this Agreement." *Id.* at Art. 9.02

67. The Litigation Trustee submits that, in light of the exceedingly dim prospect of further recovery on any claims and causes of action, no purpose is served by continuing to administer the Litigation Trust. Given the very limited funds the Litigation Trust is left with, the Litigation Trustee submits that payment of the Outstanding Professional Expenses and the balance of remaining funds to Settle is as close as the Litigation Trust will come to "payment of all costs, expenses, and obligations incurred in connection with administering the Trust, and Distribution of all Trust Assets in accordance with the provisions of the Plan, the Confirmation Order, and this Agreement" as contemplated by the Litigation Trust Agreement.

68. As such, once these payments are made, the Litigation Trustee respectfully requests authority from the Court for the Litigation Trust to be terminated in accordance with the terms of the Litigation Trust Agreement.

## NOTICE

69. The Litigation Trustee will serve copies of this Motion on: (a) the Office of the United States Trustee for the District of Delaware; (b) the Subchapter V Trustee; (c) all creditors of the Debtors. The Litigation Trustee submits that no other or further notice need be given.

## NO PRIOR REQUEST

70. No prior request for the relief sought in this Motion has been made to this or any other Court.

**WHEREFORE**, the Litigation Trustee respectfully requests that the Court enter the Proposed Order: (a) granting the Motion; (b) dismissing the Chapter 11 Cases; (c) authorizing the Litigation Trustee to remit the remaining funds to Settle, after payment of the Partial Professional Fee Payments; (d) authorizing termination of the Litigation Trust; and (d) granting such other relief as the Court deems just and proper.

Dated: March 31, 2026
Wilmington, Delaware

**PASHMAN STEIN WALDER HAYDEN, P.C.**

*/s/ Michael J. Custer*
Joseph C. Barsalona II (No. 6102)
Michael J. Custer (No. 4843)
824 Market St., Suite 800
Wilmington, DE 19801-1242
Telephone: (302) 592-6496
Email: jbarsalona@pashmanstein.com
mcuster@pashmanstein.com

-and-

Joshua P. Law (admitted *pro hac vice*)
21 Main Street
Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200
Email: jlaw@pashmanstein.com

*Counsel to Peter Furman, in his sole capacity as the Litigation Trustee for the BLG Litigation Trust*