**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| BLANK LABEL GROUP, INC., *et al.*, | Case No. 23-10286 (JTD) |
| Debtors.[1] | Jointly Administered |
| | **Re: D.I. 385** |

**DECLARATION OF PETER FURMAN IN SUPPORT OF LITIGATION TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (A) DISMISSING THE CHAPTER 11 CASES; (B) AUTHORIZING THE LITIGATION TRUSTEE TO REMIT REMAINING FUNDS TO SECURED PARTY; (C) AUTHORIZING TERMINATION OF THE LITIGATION TRUST; AND (D) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1764, I, Peter Furman declare as follows under the penalty of perjury:

1. I am currently the Litigation Trustee (the "Litigation Trustee") of the litigation trust (the "Litigation Trust") of the bankruptcy estates of the above-captioned debtors, Blank Label Group, Inc., BlackLapel Custom Clothiers, Inc. and Ratio Clothing, LLC (collectively, the "Debtors"), created pursuant to *Subchapter V Debtors' First Modified Amended Plan of Liquidation* (together with the Plan Supplement and all exhibits and any other modifications, amendments, or supplements thereto, the "Plan") [D.I. 313].

2. I am over 18 years of age. If called as a witness, I could and would competently testify with respect to the matters set forth in this declaration from my own personal knowledge or from knowledge gathered from the Debtors' and the Litigation Trust's advisors, my review of

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Blank Label Group, Inc. (6183); BlackLapel Custom Clothiers, Inc. (3725); and Ratio Clothing, LLC (8330). The Litigation Trust's mailing address is 641 Lexington Avenue, 15th Floor, New York, New York 10022.

relevant documents or my opinion based upon my experience concerning the Litigation Trust, and before that, as independent director of the Debtors.

3. On March 31, 2026, I caused to be filed with this Court the *Litigation Trustee's Motion for Entry of an Order (A) Dismissing the Chapter 11 Cases; (B) Authorizing The Litigation Trustee to Remit Remaining Funds to Secured Party; (C) Authorizing Termination of the Litigation Trust; and (D) Granting Related Relief* (the "Motion to Dismiss") [D.I. 385].[2]

4. I hereby submit this declaration (the "Declaration") in support of the Motion to Dismiss and incorporate same by reference.

**CREATION OF THE LITIGATION TRUST**

5. On March 8, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court. On March 10, 2023, the Court entered an order directing that the Debtors' petitions be jointly administered [D.I. 22].

6. On December 7, 2023, the Court entered an order confirming the Plan [D.I. 333].

7. The Plan provided for the creation of the Litigation Trust "for the purpose of selling any remaining Estate Assets, prosecuting and resolving the [Debtors'] Causes of Action, objecting to Claims, resolving Disputed Claims, and effecting the Distributions to be made under the Plan . . . ." Plan at Art. 2.5(A). The Litigation Trust Agreement also reflects this objective. Litigation Trust Agreement at Art. 2.02.

8. As part of the Litigation Trust Agreement incorporated by the Plan Supplement and approved in connection with confirmation of the Plan, I was appointed the Litigation Trustee and tasked with carrying out the objectives of the Litigation Trust.

[2] Capitalized terms used herein but not defined have the meaning given to them in the Motion to Dismiss.

## LITIGATION TRUST'S EFFORTS

9. Since its inception, the Litigation Trust has investigated and, to the extent warranted, pursued three categories of potential claims and sources of recovery: (a) Avoidance Actions; (b) claims against former insider Danny Wong ("Mr. Wong") under clawback causes of action or otherwise (the "Wong Claims"); and (c) claims against Fan Bi ("Mr. Bi") under clawback causes of action or otherwise (the "Bi Claims").

10. With respect to the Avoidance Actions, the Litigation Trust implemented procedures for pursuing such actions against targets who received potentially preferential payments during the three-month period prior to the Petition Date as well as against potential insiders who had received any payments during the one-year period prior to the Petition Date.

11. The Litigation Trust's advisors and I engaged in an examination of the Debtors' financial records for those periods, identified potential clawback targets and the sums received, and issued demand letters to approximately fifteen domestic and international targets seeking to induce recovery without the need for costly litigation. The demand letters included an offer to settle such preference claims for 85% of their face value in an effort to promote cooperation.

12. Several of the targets responded, asserting defenses and counterclaims to the clawback claims, which I and the Litigation Trust's advisors evaluated and determined were viable. Other targets did not respond to the Litigation Trust's settlement offer. After further research and investigation, I determined that pursuing litigation against those targets was likely to be too risky and costly to justify the relatively modest potential recoveries that might be obtained. The Litigation Trust was therefore only able to recover a settlement payment from one target, in the amount of $9,615.00.

13. With respect to the Wong Claims, on April 30, 2024, I filed the *Motion for Order Authorizing the BLG Litigation Trust to (A) Conduct a 2004 Examination of Danny Wong; and (B) Seek Related Document Production* [D.I. 363] (the "Rule 2004 Motion"). After I and my advisors conducted substantial and extended negotiations with Mr. Wong and his counsel, who advised that Mr. Wong had been living in South Korea for several years, the Court entered an *Order Directing Examination of Danny Wong and the Production of Document* [D.I. 369] (the "Rule 2004 Order") on May 30, 2024, without any objections from Mr. Wong.

14. On July 22, 2024, counsel for Mr. Wong tendered his responses and document production for the Rule 2004 examination. After reviewing Mr. Wong's responses and nearly 2,000 pages of document production, I and the Litigation Trust's advisors determined that pursuing further litigation against Mr. Wong was not justified given the expense of doing so, based on the evidence available at the time, but reserved final judgment on the matter until after a Rule 2004 examination against Mr. Bi could be completed. I understand this determination to have been based on several factors, including but not limited to, (a) the existence of potentially meritorious substantive defenses against any clawback action, including that Mr. Wong was neither a statutory nor non-statutory insider and had not been actively involved in the Debtors' management for many years; (b) the nature and complexity of any clawback claims against Mr. Wong; (c) the need to retain a forensic accounting expert to trace transfers between Mr. Wong's and Mr. Bi's numerous personal and business accounts, both domestic and international; (d) the lack of certainty as to obtaining a judgment in an amount sufficient to offset the costs of such litigation and net a positive recovery for Litigation Trust beneficiaries; (e) the apparent difficulty of immediately collecting any substantial amounts from Mr. Wong's international assets even if judgment were entered

against Mr. Wong in the United States; and (f) the limited funds immediately available to the Litigation Trust.

15. With respect to the Bi Claims, given the very limited resources the Litigation Trust had to investigate and prosecute any claims against Mr. Bi, I first needed to retain counsel to pursue any such claims on a contingency basis. Upon my appointment, I began a comprehensive search for counsel to investigate and potentially litigate the Bi Claims, engaging in discussions with approximately twenty to thirty firms either experienced in litigating or financing clawback actions on behalf of bankruptcy estates and their stakeholders, or serving as a referral sources for such firms. Nevertheless, I was unable to retain counsel due to the firms' concerns regarding a contingency fee on a relatively modest potential liability, the potential defenses to the Bi Claims, the complexity and cost of investigation into and litigation of the Bi Claims, and the dubious collectability of any resultant judgments from Mr. Bi's assets, which are known to at least be partially sheltered in China, Australia, and other countries overseas.

**REASONS FOR SEEKING RELIEF**

16. At its outset, the Litigation Trust had approximately $157,000 in escrowed funds to carry out its objective. The Litigation Trust is now left with $67,941.10.

17. For the reasons stated above, I believe the Litigation Trust has reached an endpoint in its investigation and potential litigation of claims and causes of action. The investigation has revealed that further pursuit of claims and causes of action by the Litigation Trust faces prohibitive hurdles on the merits and collectability, is not cost-effective given the Litigation Trust's relatively modest assets and does not present a realistic path for recovery for trust beneficiaries.

18. With no reasonable prospect of meaningful recovery, the continuation of these Chapter 11 cases will simply cause the Debtors to incur additional administrative and professional expenses that would deplete what little funding the Litigation Trust has left.

19. Conversion to cases under Chapter 7 is also not financially sound, as the remaining funds would simply be administered to partially satisfy Settle Funding, LLC's ("Settle") secured claim, leaving no distribution to other creditors.

20. In light of the Litigation Trust's limited remaining funds, my firm and my counsel's firm have agreed to waive the Outstanding Professional Fees that have been incurred for services on behalf of the Litigation Trust. Settle has agreed, however, to allow a portion of the remaining funds in the Litigation Trust to be used to satisfy the Outstanding Professional Expenses the Litigation Trust's professionals have incurred, which total approximately $6,700, with the balance to be remitted to Settle in respect of its secured claim.

21. Once the Outstanding Professional Expenses have been paid and the Litigation Trust's remaining funds have been distributed to Settle, I believe that termination of the Litigation Trust pursuant to the Litigation Trust Agreement is appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 31, 2026
New York, NY

*/s/ Peter Furman*
Peter Furman, Litigation Trustee